# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DORIAN CHRISTIAN CARVALHO, | CIVIL ACTION NO. 3:11-1995 |
| Plaintiff, | |
| v. | (Mannion, D.J.) |
| WARDEN BRYAN BLEDSOE, et al., | |
| Defendants. | |

## MEMORANDUM

## I.    BACKGROUND

Dorian Christian Carvalho, formerly a federal inmate, filed this amended *Bivens*[1] and Federal Tort Claims Act[2] complaint alleging that numerous defendants violated his rights during his incarceration at Lewisburg United States Penitentiary ("USP-Lewisburg").    (Doc. 57). Carvalho raises several claims primarily related to assaults that he suffered at the hands of his cellmates at USP-Lewisburg.

The first assault occurred on November 26, 2010, when Carvalho's cellmate, Franklin Stokes, "without provocation or reason" attacked Carvalho.  (Doc. 57 at 11).  Carvalho suffered "serious bodily injury" during

---

[1]    *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).
[2]    28 U.S.C. §§ 2671-80.

the assault.  (*Id.*).  The second assault occurred on December 11, 2010, after Carvalho was placed in a cell with Donald Taylor.  (*Id.* at 12-15).  Taylor viciously assaulted Carvalho; Carvalho's ears were chewed off, he was slashed with a razor blade, and his nose, cheekbones, and left eye socket were broken before prison guards stopped the assault.  (*Id.* at 15).  As a result, Carvalho spent three days in a hospital and underwent multiple surgical procedures.  (Doc. 163-2 at 2-70).

Following the second assault, Carvalho began to refuse cellmates— allegedly as a result of post-traumatic stress disorder—but Defendants continually attempted to force Carvalho to accept cellmates.  (Doc. 57 at 21-23; 25-26).  Because Carvalho refused to accept cellmates and threatened to harm anyone with whom he was placed, on three separate occasions Defendants placed Carvalho in ambulatory restraints.[3]  (*Id.* at 33-34). Carvalho was placed in restraints from February 16, 2011, until February 28, 2011, and again for approximately eight hours on March 11, 2011, and finally from August 19, 2011, until September 1, 2011.  (Docs. 163-3 at 57, 73-74, 85; 163-4 at 37; 163-5 at 82-85).

---

[3]  Ambulatory restraints restrict some of an inmate's movement and include connected handcuffs and leg restraints, as well as chain that runs across the inmate's torso.  (Docs. 170-17 at 39; 170-19 at 30).  Inmates in ambulatory restraints are still capable of eating, drinking, and using the restroom on their own.  (Doc. 170-17 at 43-44).

In 2012, Carvalho amended his complaint to allege, as relevant here, that Defendants violated his Eighth Amendment rights by failing to protect him from the assaults and employing excessive force by placing him in restraints, and violated his First Amendment right of access to the courts. (Doc. 57 at 23-26, 33-37). After several delays in the proceedings, Defendants filed this motion for summary judgment, asserting that (1) certain Defendants are improperly named, (2) Carvalho failed to administratively exhaust his claims with the exception of his First Amendment claim, and (3) Carvalho's claims fail on the merits. (Docs. 160, 164). Carvalho in turn contends that his failure to exhaust administrative remedies should be excused because such remedies were not actually available. (Doc. 170 at 15-22; Doc. 179). As to the merits of his claims, Carvalho concedes that summary judgment is appropriate as to several claims and individuals, but argues that Bryan Bledsoe and Matt Edinger are liable for failing to protect Carvalho from the assaults and for using excessive force related to Carvalho's placement in restraints, and under the First Amendment for impeding his access to the courts.[4] (Doc. 170 at 13-14; *see id.* at 22-40).

Because Defendants' motion for summary judgment relied in part on the contention that Carvalho failed to exhaust his administrative remedies,

---

[4] In light of this concession, the Court will analyze only the three contested claims.

this Court issued an order, pursuant to *Paladino v. Newsome*, 885 F.3d 203, 211 (3rd Cir. 2018), and permitted the parties to supplement the record with any pertinent documents or arguments related to the exhaustion of Carvalho's administrative remedies. (Doc. 178). Carvalho submitted a timely supplemental brief (Doc. 179), and the matter is now ripe for consideration.

## II. DISCUSSION

"Summary judgment is appropriate when, drawing all reasonable inferences in favor of the nonmoving party, the movant shows that there is no genuine dispute as to any material fact, and thus the movant is entitled to judgment as a matter of law." *Minarsky v. Susquehanna Cty.*, 895 F.3d 303, 309 (3d Cir. 2018) (internal quotation marks omitted). "A dispute is genuine if a reasonable trier-of-fact could find in favor of the non-movant, and material if it could affect the outcome of the case." *Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ.*, 880 F.3d 643, 650 (3d Cir.) (internal quotation marks omitted), *cert. denied*, 139 S. Ct. 167 (2018). In considering a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

A. *Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e, requires that federal prisoners exhaust all available administrative remedies prior to filing suit in federal court. *Rinaldi v. United States*, 904 F.3d 257, 264-65 (3d Cir. 2018). "Exhaustion is thus a non-jurisdictional prerequisite to an inmate bringing suit and, for that reason, . . . it constitutes a threshold issue that *courts* must address to determine whether litigation is being conducted in the right forum at the right time." *Id.* at 265 (internal quotation marks omitted). To exhaust administrative remedies in federal prison:

> As a general matter, inmates must (1) attempt an informal resolution with staff at the institution [by filing a BP-8 form]; (2) file a formal complaint with the institution [with a BP-9 form]; (3) file an appeal[, using a BP-10 form,] to the appropriate Regional Director if the inmate is not satisfied with the institution's response to the formal complaint; and (4) file another appeal to the General Counsel [with a BP-11 form] if the inmate is not satisfied with the Regional Director's response to the appeal.

*Id.* (internal citations omitted).

Prisoners must complete the BP-8 stage and file a BP-9 within 20 days of the date of the incident of which the prisoner complains. (Doc. 170-23 at 5-6). The BP-10 must then be filed[5] with the Regional Director within 20 days of the date that the Warden signs his response to the prisoner's BP-9. (*Id.* at 7-8). The BP-10 must be "accompanied by one complete copy or

---

[5] The record reflects that the Regional Director deems appeals filed on the date they are received, not the date that inmate deposits the appeal in the prison's mail system. (Doc. 179-1 at 23).

duplicate original" BP-9 form.  (*Id.* at 8).  Finally, the BP-11 must be filed with the General Counsel within 30 days of the date that the Regional Director signs the response to the prisoner's BP-10.  (*Id.*).  All deadlines may be extended upon a showing of good cause.  (*Id.* at 6, 8).

Despite containing a strict exhaustion requirement, "[t]he PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available.'"  *Rinaldi*, 904 F.3d at 266 (quoting *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)).  Thus,

> the Supreme Court [has] identified "three kinds of circumstances in which an administrative remedy, although officially on the books," is not "available" because it is "not capable of use to obtain relief": (1) when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use," such as when no ordinary prisoner can discern or navigate it; or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Id.* at 266-67 (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1859-60 (2016)). Under the third category, administrative remedies are rendered unavailable "where a prison official inhibits an inmate from resorting to them through serious threats of retaliation and bodily harm."  *Id.* at 267.

"The burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant."  *Id.* at 268.  "But once the defendant has

established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." *Id.* When considering exhaustion in the context of a motion for summary judgment, "a district court may not make credibility determinations or engage in any weighing of the evidence." *Paladino*, 885 F.3d at 209-10 (internal quotation marks omitted). "Rather, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor." *Id.* at 210 (internal quotation marks omitted).

As an initial matter, Defendants concede that Carvalho exhausted his administrative remedies regarding his claim for denial of access to the courts. (Doc. 164 at 3-4, 20). Carvalho in turn acknowledges that he did not fully exhaust administrative remedies with respect to his failure to protect and excessive force claims, but asserts that such remedies were not available to him. (Doc. 170 at 15-22; Doc. 179). Carvalho contends that two factors conspired to render administrative remedies unavailable. First, Carvalho was placed in restraints around the time that he was required to appeal the denial of his failure-to-protect-grievance; this denied him both the ability to draft his appeal, and access to the documents necessary to perfect such an appeal. (Doc. 179 at 3-6). Second, Carvalho asserts that Edinger worked to thwart Carvalho from filing grievances, which prevented exhaustion of

both claims. (*Id.* at 6-9).

As to Carvalho's first contention, he filed a BP-8 related to the Taylor assault on January 5, 2011, which was denied on January 7, 2011. (Doc. 179-1 at 2, 4-5). He filed a BP-9 on January 21, 2011, which was rejected on January 27, 2011, for containing more than one issue. (*Id.* at 7-8, 10; Doc. 163-1 at 15). Carvalho was permitted to resubmit the form within 10 days, and his timely refiled BP-9 was denied on February 25, 2011. (Doc. 179-1 at 10, 15-16, 18; Doc. 163-1 at 16). Carvalho completed a BP-10 on March 19, 2011—which was received by the Regional Office on March 28, 2011—and that appeal was rejected as untimely on April 5, 2011. (Doc. 179-1 at 20-21, 23; Doc. 163-1 at 16).

The key dispute thus centers around Carvalho's failure to timely appeal the February 25, 2011, denial of his BP-9, which appeal must have been filed on or before March 17, 2011. Carvalho was placed in ambulatory restraints on February 16, 2011 and was not released until the morning of February 28, 2011. (Doc. 163-5 at 86; 163-6 at 26, 28, 64). When prisoners are placed in restraints, their personal property—including carbon copies of BP-9 forms required for an appeal—is seized, and they are not permitted to file grievances. (Doc. 170-19 at 38-40, 57-58). Carvalho asserts that, after his release from restraints, his property was not returned until March 4, 2011.

8

(Doc. 179-1 at 27). Carvalho then had "difficulties" in obtaining a BP-10 from Edinger (*id.*), and was again placed in restraints on March 11, 2011, which again deprived him of his personal property. (Doc. 163-3 at 55-59, 75-76). Given that it took anywhere from several days to one month for property to be returned (Doc. 170-5 at 57; Doc. 170-19 at 57-78), Carvalho's placement in restraints effectively ran the clock on his ability to timely file his BP-10, since it required that he receive his property, draft an appeal, mail that appeal, and have the appeal reach the Regional Director within four days, which constitutes a seemingly impossible task.[6]

This alone may be sufficient to find that administrative grievance procedures were unavailable to Carvalho with regard to his failure to protect claim. Carvalho's claim of unavailability is, however, buttressed by additional facts that strongly support the conclusion that administrative procedures were unavailable for both his failure to protect and excessive force claims.

Specifically, Carvalho asserts that his failure to administratively exhaust his claims is due largely to Edinger's machinations.[7] (Doc. 170 at

---

[6] Carvalho testified at his deposition that delays in the return of his property often resulted in missed filing deadlines. (Doc. 170-5 at 61-62). He further asserted that "every time" property was returned after his release from restraints, carbon copies of grievances and other personal paperwork were missing. (*Id.* at 57).

[7] Carvalho also asserts that, in retaliation for filing grievances, one correctional officer labeled Carvalho a "snitch," which led to threats against Carvalho's safety. (Doc. 179 at 6-7). This, Carvalho asserts, effectively deterred him from filing grievances. (*Id.* at 8-9, 13-14). However,

18-19; Doc 179 at 6-15).  First, although Carvalho relied on Edinger to distribute and collect all grievance forms (Doc. 170-19 at 52-53), Carvalho stated that Edinger "would refuse outright to give you specific grievances. He would refuse to take your grievances when you were trying to file them. He would return your grievances without the appropriate copies that you . . . would need for the next step."  (Doc. 170-5 at 30; *see id.* at 57-58).  Edinger also refused to provide Carvalho with necessary writing utensils to complete grievance forms (*id.* at 57), even though it was Edinger's job to provide prisoners with pens and pencils.  (Doc. 170-19 at 57-58).

Taken together, these acts are sufficient to excuse Carvalho's failure to exhaust administrative remedies.  Edinger's refusal to provide grievance forms or writing utensils, or collect grievance forms from Carvalho, plainly rendered the grievance process unavailable.  *See Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003) (failure to exhaust "excused if there were a failure to provide grievance forms").  Additionally, because carbon copies of denied BP-8 or BP-9 forms are required to file an appeal of that denial, the failure to

---

these actions occurred prior to Carvalho's transfer to Edinger's unit, and prior to Carvalho's placement in restraints.  (Doc. 163 ¶ 150; Doc. 170-5 at 28-29; Doc. 179-1 at 33).  Because these retaliatory acts did not occur during the period when any grievance related to Carvalho's placement in restraints was due and did not involve any correctional officers who had a supervisory role over Carvalho or any input or responsibility regarding Carvalho's restraint-related grievances, there is little connecting that act with Carvalho's failure to exhaust his administrative remedies.

provide carbon copies similarly rendered administrative remedies unavailable.

Defendants do little to undermine Carvalho's testimony regarding Edinger's actions. First, Defendants note that Carvalho's assertion is unsupported by anything other than his own deposition testimony. (Doc. 174 at 14). While this is true, deposition testimony alone may support a finding of unavailability, *Paladino*, 885 F.3d at 209, and Defendants point to no evidence controverting Carvalho's statements. (*See* Docs. 163, 164, 174).

Second, Defendants note that Carvalho was able to exhaust ten administrative claims between 2010 and 2012, which they assert undercuts Carvalho's claim that remedies were unavailable. (Doc. 174 at 14). However, none of those claims were exhausted around the relevant time period for this case; one claim was exhausted prior to Carvalho's transfer to USP-Lewisburg, and the remainder were filed in or after July 2011. (Doc. 163 ¶¶ 18-25). Moreover, none of the exhausted grievances related to Edinger. (*Id.*). Rather, it appears that between April and September 2011— when any grievance related to Edinger—Carvalho attempted to bypass Edinger by filing sensitive grievances, all of which were rejected as being non-sensitive in nature. (*See* Doc. 179-1 at 33; Doc. 179-2 at 6, 9-21). As the United States Court of Appeals for the Third Circuit has observed, "it [i]s

unrealistic to expect the inmate to file a grievance against the very people who were . . . preventing him from obtaining the proper forms, and the fact that an inmate files unrelated claims does not prove that remedies were available within the system for purposes of exhaustion." *Rinaldi*, 904 F.3d at 270 (brackets and internal quotation marks omitted).

The fact that Carvalho exhausted certain claims demonstrates that he was aware of how to exhaust claims, aware that exhaustion was necessary, and was capable of pursuing such remedies. The claims that Carvalho exhausted were relatively unimportant as compared to issues related to Carvalho's physical and mental wellbeing. It defies logic that Carvalho would exhaust certain claims yet intentionally fail to exhaust consequential claims related to life-altering injuries sustained in an assault or his placement in restraints for twelve or thirteen days at a time, which Carvalho described as "torture." (Doc. 170-5 at 30, 67-68). Rather than aid Defendants, the fact that Carvalho exhausted other administrative remedies gives credence to Carvalho's assertion that he was prevented from exhausting his administrative remedies. Viewed in the light most favorable to Carvalho, a reasonable factfinder could conclude that Carvalho attempted to exhaust his administrative remedies but was prevented from so doing by factors beyond his control. Consequently, the Court concludes that administrative remedies

were not available to Carvalho, and his failure to exhaust those remedies is excused.

B. *Merits of Summary Judgment Motion*

Defendants assert that, regardless of whether Carvalho exhausted his administrative remedies, his underlying claims fail on the merits. (Doc. 164 at 22-52; Doc. 174 at 3-13). Defendants argue that Carvalho's failure to protect claim fails because neither Bledsoe nor Edinger had any role in Carvalho's cell assignments or any knowledge that he faced a substantial risk of harm from his cellmates. (Doc. 164 at 29-33; Doc. 174 at 3-6). As to Carvalho's excessive force claim, Defendants argue that Edinger had no personal involvement in Carvalho's placement or maintenance in restraints and that, in any event, the use of restraints was justified because Carvalho refused to follow orders and displayed signs of imminent violence. (Doc. 164 at 39-42; Doc. 174 at 7-9). Defendants further contend that Carvalho's access to the courts claim fails because he suffered no injury. (Doc. 164 at 42-47; Doc. 174 at 10-13). Finally, Defendants maintain that, at the very least, they are entitled to qualified immunity because Carvalho's constitutional rights were not clearly established at the time they were violated. (Doc. 164 at 48-52).

Carvalho in turn asserts that both Bledsoe and Edinger were

13

personally involved in the constitutional violations. (Doc. 170 at 22-25). As to the excessive force claim, Carvalho asserts that a genuine issue of material fact should preclude summary judgment, as no emergency permitted Defendants to use restraints for extended periods of time. (*Id.* at 26-33). With regard to the failure to protect claim, Carvalho argues that Defendants were aware (1) of pervasive and well-documented history of inmate-on-inmate violence at USP-Lewisburg, (2) that Carvalho's cellmates had a history of assaulting other prisoners, and (3) that Carvalho's cooperation into the investigation of his first assault placed him in jeopardy because he would be viewed as a "snitch." (*Id.* at 33-37). Finally, Carvalho contends that summary judgment is inappropriate with regard to his First Amendment claim only if the Court concludes that he failed to exhaust his administrative remedies, as this would effectively establish the requisite injury required to sustain his claim. (*Id.* at 37-40).

i. <u>Eighth Amendment Failure to Protect Claim</u>

First, Carvalho asserts that Defendants are liable for failing to protect him from the two inmate assaults because Defendants were aware of the risk that Carvalho faced and because the prison did not provide enough

warning devices at USP-Lewisburg.[8]  (Doc. 57 at 23-26).  "[T]he Eighth Amendment's Cruel and Unusual Punishments Clause imposes on prison officials 'a duty to protect prisoners from violence at the hands of other prisoners.'"  *Bistrian v. Levi*, 696 F.3d 352, 366 (3d Cir. 2012) (quoting *Farmer v. Brennan,* 511 U.S. 825, 833 (1994)).  "Still, not 'every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety.'"  *Id.* at 367 (quoting *Farmer,* 511 U.S. at 834 (ellipsis omitted)).

> To [maintain] a claim for damages against a prison official for failure to protect from inmate violence, an inmate must . . . show [that] (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm.

*Id.*

"Deliberate indifference in this context is a subjective standard: the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."  *Id.* (internal quotation marks omitted).  "A plaintiff can, however, prove an official's actual knowledge of a substantial risk to his safety 'in the usual ways, including inference from circumstantial

---

[8]  Although Carvalho ostensibly continues to pursue his claim related to the failure to provide warning devices, he provides no evidence or argument to support his claim, and summary judgment is therefore appropriately granted in favor of Defendants on this claim.

evidence' . . . [i]n other words, 'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Id.* (quoting *Farmer,* 511 U.S. at 842).  Thus:

> Prison officials may escape liability for deliberate indifference claims in several ways.  They "might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." [*Farmer*, 511 U.S.] at 844, 114 S. Ct. 1970.  "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*  "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable" on a failure-to-protect claim. *Id.* at 845.

*Id.* at 367-68.

The Court concludes that Carvalho fails to establish that Edinger was deliberately indifferent to any risk.  The uncontroverted evidence demonstrates that Carvalho had no interaction with Edinger until January or February 2011, when Carvalho was assigned to Edinger's cell block and Edinger became Carvalho's correctional counselor.  (Doc. 170-5 at 28-29).  Because Edinger only made cell placement decisions for inmates within his cell block, he had no input on Carvalho's cellmate assignments in November and December 2010 when the assaults occurred.  (Doc. 170-19 at 16-17; Doc. 170-17 at 23, 30).  There is no evidence that Edinger was personally

involved in placing Carvalho with Stokes or Taylor, and Edinger therefore is not responsible for failing to protect Carvalho from those assaults.[9]  *See Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." (citation and internal quotation marks omitted)).

Similarly, although Bledsoe directed USP-Lewisburg's operations, he had no role "in the day to day assignment of inmates to specific cells or cellmates." (Doc. 163-1 at 83).  Thus, Bledsoe would not have been responsible for placing Carvalho in a cell with either Stokes or Taylor. Moreover, there is no evidence that Bledsoe knew of a risk to Carvalho. Carvalho did not bring to Bledsoe's attention any risk of harm posed by his cellmates; he did not request to be separated from either inmate prior to the assaults and had no interaction with Bledsoe regarding his cellmate assignments until after the assaults occurred.[10]  (Doc. 170-5 at 18, 22, 28).

---

[9]   While Carvalho asserts that Edinger knew of the danger posed by Carvalho's cellmates because Carvalho "repeatedly tried to inform Defendant Edinger, his counselor starting in January [2011] . . . of the risk he faced in *future* cellmate assignments" (Doc. 170 at 25 (emphasis added)), this does nothing to establish Edinger's involvement in Carvalho's cellmate assignments in 2010 or Edinger's knowledge that Carvalho faced a risk of harm in late 2010.

[10]   Carvalho asserts that, because he cooperated with prison officials regarding the first assault, other inmates would view him as a "snitch" and prison officials thus knew that he would be at

Thus, there simply is no evidence demonstrating that Bledsoe had any personal involvement in assigning cellmates to Carvalho or knew of a substantial risk to his safety.[11]

Because Bledsoe was not personally responsible for assigning cellmates and had no knowledge of a specific risk to Carvalho, liability may lie against him only if conditions at USP-Lewisburg were so dangerous that Bledsoe had knowledge of a substantial risk to all inmates posed by their cellmates.[12]  *See Farmer*, at 511 U.S. at 843 (noting irrelevance of knowledge "that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault" if "all prisoners in

---

greater risk of assault.  (Doc. 170 at 36).  As the Third Circuit has previously stated "[g]iven prisoners' attitudes about 'snitches,' it is reasonable to infer that placing [a cooperating prisoner] in a locked recreation pen with any violent inmates, not only those he specifically cooperated against, created a substantial risk of serious harm."  *Bistrian*, 696 F.3d at 371.  Nevertheless, Carvalho provides no evidence that other prisoners knew of his cooperation or labeled him a snitch as a result.  Absent such evidence, it cannot be inferred that Defendants knew Carvalho was at greater risk than any other prisoner at USP-Lewisburg.  Similarly, although Carvalho contends that Stokes' and Taylor's history of assaults placed Bledsoe on notice that those inmates were dangerous, those inmates had fewer instances of assault than did Carvalho.  (Doc. 174 at 5 n.5).  Carvalho fails to explain how the histories of Stokes or Taylor indicate a greater degree of dangerousness than does his own history.

[11]  Carvalho asserts that knowledge of a substantial risk of injury may be imputed to Bledsoe because, beginning in January 2011, Carvalho sent Bledsoe sensitive grievances informing Bledsoe "of the risk he faced in future cellmate assignment."  (Doc. 170 at 25).  As with Edinger, this after-the-fact knowledge cannot establish Bledsoe's knowledge in 2010 that Carvalho faced a risk of harm.

[12]  Generally dangerous conditions at USP-Lewisburg would not permit liability against Edinger as there is no evidence that Edinger had any responsibility for the conditions at USP-Lewisburg or that he had any power to alter those conditions.

18

[plaintiff's] situation face such a risk"). The evidence, however, is insufficient to permit a factfinder to conclude that the conditions at USP-Lewisburg reached such a threshold.

Although Carvalho cites four to five deaths at USP-Lewisburg and "pervasive violence in cells" over the course of approximately eight years (Doc. 170 at 37), the information provided is insufficient to demonstrate that violence at USP-Lewisburg was so pervasive that Bledsoe should have known that all inmates confined there were at risk from their cellmates. First, although Bledsoe acknowledged that there were "a number of assaults" at USP-Lewisburg during his tenure there (Doc. 170-17 at 100), there is no indication that the number of assaults were inordinate. To the contrary, Bledsoe testified that he had witnessed similar levels of violence in at least one other prison (*id.* at 101), and Edinger testified that, between 2013 and late 2017, there was only one fight in the unit that he ran, which at capacity housed 82 inmates at one time. (Doc. 170-19 at 10, 21-22). Moreover, Edinger estimated that approximately ninety-five percent of inmates assigned to USP-Lewisburg "graduated" from the facility, indicating that the vast majority of inmates did not regularly engage in assaults.[13] (*Id.* at 13-

---

[13] Inmates who were unable to comply with USP-Lewisburg's rules and, thus, did not graduate, would either remain at USP-Lewisburg or in "extreme cases" be sent to the Bureau of Prison's ("BOP") supermax facility in Florence, Colorado. (Doc. 170-17 at 20-21; *see* Doc. 170-19 at

14). Finally, Carvalho provides no information connecting any assaults to the practice of double celling inmates.

The record demonstrates then that assaults within USP-Lewisburg appear to have been somewhat irregular, rather than "longstanding [and] pervasive" *Farmer*, 511 U.S. at 842, and are insufficient to impute knowledge to Bledsoe that all inmates at USP-Lewisburg were at a substantial risk of assaults from their cellmates. *See Westmoreland v. Brown*, 883 F. Supp. 67, 76 (E.D. Va. 1995) (concluding "that there were as many as 2.5 reported assaults per day in January does not permit a conclusion that each of the more than 1300 inmates was subjected to constitutionally prohibited substantial risk of harm solely by virtue of his incarceration in the City Jail."); *Walters v. Div. of Youth Servs.*, No. 4:13-CV-1475 RLW, 2015 WL 4566805, at *11–12 (E.D. Mo. July 28, 2015) (determining that, although inmates "had to 'watch their backs . . .' and . . . 'being nervous was normal,'" evidence did not establish substantial risk of harm to inmates as "fights were rare . . . and quickly controlled").

Second, although murder should never occur in a prison, when considered in context, four to five murders over the course of eight years is insufficient to infer that Bledsoe was aware of a pervasive and substantial

_____

15).

risk of harm to all inmates at USP-Lewisburg. USP-Lewisburg holds approximately 1,200 inmates at any time, with most inmates rotating out of the prison in 12 to 24 months. (Doc. 170-19 at 10, 14-15). Thus, over the course of eight years when—at most—five murders occurred, between 4,800 and 9,600 inmates passed through USP-Lewisburg. Assuming only 4,800 prisoners passed through USP-Lewisburg, the murder rate accounts for approximately one-tenth of one percent of inmates. Moreover, Carvalho provides no information underlying those incidents and it is therefore unclear whether the murders occurred in cells and were a result of prisoners having cellmates, or whether they were wholly unconnected to the issue of shared cells. As a consequence, while those murders are tragic, they do not allow a reasonable factfinder to conclude that Bledsoe knew of a substantial risk of injury or death to all inmates as a result of having a cellmate. The Court therefore concludes that there is no genuine issue of material fact that would preclude summary judgment in Bledsoe's favor.

Finally, the Court notes that, even if Carvalho could establish the requisite knowledge, Defendants would be entitled to summary judgment because the evidence demonstrates that they "responded reasonably to the risk" posed to inmates from sharing cells. *Bistrian*, 696 F.3d at 366. Bledsoe and Edinger explained that it was not practical or desirable for inmates to

have individual cells.  First, when USP-Lewisburg was near full-capacity, there simply were no single cells available for the prisoners, limiting the practicality of separating inmates.  (Doc. 190-19 at 14-15, 25-26).  Second, assigning cellmates helped reduce the instances of suicide from isolation (*id.* at 15-16), and helped inmates adjust to the rules that they would need to follow at other correctional institutions upon their transfer out of USP-Lewisburg.  (Doc. 170-17 at 16-17).  This means that it was desirable for both the BOP and individual prisoners to have a compatible cellmate.

Given the necessity of providing cellmates, the prison took reasonable steps to mitigate any risk that prisoners faced as a result of double celling. Edinger testified that, before inmates were paired, they were screened and interviewed to determine whether there were any individuals or groups from whom the inmate needed to be separated.  (Doc. 170-19 at 18-19).  This included evaluating gang affiliations, history of violence or misconduct, mental health, and whether the prisoner had provided confidential information to authorities.  (*Id.* at 19, 26-28; *see* Doc. 170-17 at 21-23).  The purpose of this screening process was to ensure that "it was safe for an inmate to be in with another inmate."  (Doc. 170-17 at 22).

Other courts have concluded that similar processes and protections insulate defendants from liability for an inmate assault.  *Cf. Hale v.*

*Tallapoosa Cty.*, 50 F.3d 1579, 1583-84 (11th Cir. 1995) (finding summary judgment inappropriate because Defendant failed to take "measures include[ing] classifying and segregating the inmates based on their likelihood for violence; assigning inmates to cells and bunks rather than letting them choose for themselves; adequately training jailers; and adequately supervising and monitoring the inmates"); *Wiggins v. Bledsoe*, No. 3:11-CV-1298, 2017 WL 5900572, at *5 (M.D. Pa. Nov. 30, 2017) (policy sufficient to mitigate risk to inmates during recreation where officials "were required to consider an inmate's known separation needs when making cell and recreation cage assignments" and "USP-Lewisburg required that inmates removed from their cells be pat searched and screen with a hand held metal detector" before recreation); *Anderson v. James*, No. 4:08CV549RH WCS, 2010 WL 3522065, at *13 (N.D. Fla. Aug. 5, 2010) (summary judgment warranted because defendants implemented "reasonable responses to the problem of patient on patient aggression and violence" by "separat[ing] the offending patient from the housing unit and provid[ing] medication until the offending patient calms down").

## ii. Eighth Amendment Excessive Force Claim

Carvalho next alleges that he was unnecessarily placed in restraints on three occasions, which violated his Eighth Amendment rights. (Doc. 57

at 19-20, 33-34). Defendants assert that they are entitled to summary judgment because (1) Edinger was not involved in placing or maintaining Carvalho in restraints, (2) Bledsoe properly authorized restraints because Carvalho refused staff orders and displayed signs of imminent violence, and (3) Carvalho suffered no injuries from the restraints. (Doc. 164 at 28, 39-42).

The Court agrees that summary judgment is appropriate as to Edinger because the evidence demonstrates that he was not involved with the decision to place or maintain Carvalho in restraints. Edinger provided a declaration asserting that he is "not authorized to place an inmate in restraints, nor do[es he] conduct medical restraint checks on inmates who are placed in restraints." (Doc. 163-1 at 86). Similarly, in his deposition testimony Edinger stated that, to the best of his recollection, he was never "involved in any of the decision making that put [Carvalho] in restraints." (Doc. 170-19 at 61). Carvalho does not contest that Edinger was uninvolved in the decision to use or maintain restraints, but instead asserts that Edinger was personally involved because he refused to provide Carvalho with a single cell, and it was Carvalho's refusal to accept a cellmate that resulted in the use of restraints. (Doc. 170 at 24).

However, the decision to refuse Carvalho a single cell is too far removed from the use of force to justify assigning liability to Edinger.

24

Carvalho alleges that his harm resulted from his placement in restraints, not the decision to assign him a cellmate, and the evidence firmly establishes that Edinger had no role in the decisions to place Carvalho in restraints. Because the harm suffered is not directly related to Edinger's decision to assign Carvalho a cellmate, Edinger may not be held liable for the use of restraints. *See Baraka*, 481 F.3d at 210 (defendant not "responsible for a constitutional violation which he or she neither participated in nor approved." (citation and internal quotation marks omitted)); *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000) (finding no personal involvement where defendant's actions only indirectly harmed plaintiff).

Turning to the merits of the claim against Bledsoe, "[t]he Eighth Amendment prohibits the infliction of 'cruel and unusual punishments'" which includes, inter alia, the use of "excessive force against inmates." *Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2015). Claims related to the use of restraints are evaluated under the standard applicable to excessive force claims. *Id.* at 180. "A properly stated Eighth Amendment claim must allege a subjective and objective element." *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018). "First, it must appear . . . that the defendant official acted with a 'sufficiently culpable state of mind.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "Second, the conduct must have been objectively 'harmful

enough,' or 'sufficiently serious' to violate the Constitution."[14]  *Id.*  The Third

Circuit has:

> clarified that the pivotal inquiry in reviewing an inmate's [civil rights] claim for excessive force is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  In conducting this analysis of the officer's intent, we consider five factors: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response.

*Ricks*, 891 F.3d at 480 (internal quotation marks and citations omitted).

Furthermore,

> [a]s applied to mechanical restraints, the Supreme Court [has] identified particular criteria relevant to the use of excessive force test, holding that (1) where the inmate had "already been subdued, handcuffed, [and] placed in leg irons," and (2) there was a "clear lack of an emergency situation" such that "[a]ny safety concerns had long since abated," then (3) subjecting the inmate to "substantial risk of physical harm" and "unnecessary pain" serves no penological justification.

*Young*, 801 F.3d at 180 (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

With regard to Carvalho's initial placement in restraints, Carvalho does

not dispute that—on all three occasions he was placed in ambulatory

---

[14]  Defendants do not contest that the subjective portion of this test has been met.  In any event, both the force used, and the injuries sustained, cross the de minimus threshold required to sustain an excessive force claim.  *Wilkins v. Gaddy*, 559 U.S. 34, 36-37 (2010).

restraints—he refused to obey orders to accept a cellmate and threatened violence either against the proposed cellmate, prison staff, or both. (Doc. 163-3 at 57-58, 68, 83-84; Doc. 163-5 at 84). Prison officials then initiated "confrontation avoidance procedures" and were able to place Carvalho in ambulatory restraints without incident. (*Id.*). Given the threats of violence made by Carvalho, the efforts made by prison staff to reduce the force needed to restrain him, and the minimal force applied, no reasonable jury could conclude that the initial use of ambulatory restraints was impermissible. *See Abdullah v. Seba*, 658 F. App'x 83, 85 (3d Cir. 2016) (no Eighth Amendment violation where "[t]he undisputed evidence here reveals that the defendants placed Abdullah in restraints after he threatened to assault staff"); *Lucas v. Warden Lewisburg USP*, 573 F. App'x 205, 207 (3d Cir. 2014) (holding "temporary restraints were necessary to limit the threat to staff" after plaintiff threatened to assault staff). Thus, the only question is whether the continued use of ambulatory restraints violated Carvalho's Eighth Amendment rights.

a. February 16, 2011, Use of Restraints

Regarding the February 16, 2011, use of restraints, the record reflects that Carvalho was placed in ambulatory restraints at approximately 8:15 a.m. and was not released until 8 a.m. on February 28, 2011. (Doc. 163-5 at 82-

85).  During that time prison officials conducted restraint checks every fifteen minutes, Lieutenants conducted inmate checks every two hours, and Bledsoe authorized or reauthorized the use of restraints every 24 to 48 hours.  (Doc. 163-5 at 82-100; Doc. 163-6 at 1-87).

The Lieutenant checks tend to demonstrate that, for the first several days after Carvalho was placed in ambulatory restraints, he was upset, agitated, and occasionally threatened to harm either staff members or any inmate with whom he was placed.  (Doc. 163-6 at 45, 50, 54-55, 60). Carvalho again threatened to harm any future cellmate on February 25, 2011, but otherwise made no threats from February 22 to February 28.  (*Id.* at 28-44).  On February 17, 2011, Bledsoe authorized officials to maintain Carvalho in restraints based upon Carvalho's disrespectful attitude and threats to harm others and, on February 25, Bledsoe noted that Carvalho stated that there would be "problems" if he were released from restraints. (*Id.* at 64-66, 80).

However, the Lieutenant checks and Bledsoe's reauthorization memoranda strongly indicate that Carvalho remained in ambulatory restraints not because of any safety risk that he posed but, rather, because he refused to accept a cellmate and displayed—in the view of prison officials—a poor attitude.  Indeed, a majority of the Lieutenant checks noted

that Carvalho displayed a poor attitude either because he refused to speak with the Lieutenant, used profanity,[15] or threatened to sue prison officials for their actions. (*See id.* at 29-63). Several Lieutenant checks explicitly noted that Carvalho was instructed to accept a cellmate but refused, sometimes with the explanation that he was afraid to accept a cellmate due to previous assaults. (*Id.* at 37, 40-41, 44-45, 48, 51, 53-54, 57-58). Similarly, Bledsoe did not again use threats of violence to justify extending Carvalho's time in restraints but, rather, justified the use of restraints on the ground that Carvalho "display[ed] a poor attitude," was disrespectful and uncooperative, "ignor[ed] staff efforts to encourage him to program" (*id.* at 68), and "refus[ed] to acknowledge staff [or] engag[e] in conversation." (*Id.* at 71; *see id.* at 67-87). Carvalho testified in his deposition that prison officials used ambulatory restraints solely to force him to accept a cellmate and offered to release him from restraints if he agreed to accept a cellmate. (Doc. 170-5 at 17, 47, 48).

These facts call into question the explanation that Carvalho was kept in ambulatory restraints for twelve days because he presented a safety risk. In particular, with gaps of three or more days where Carvalho did not threaten anyone, it could reasonably be inferred that he did not pose a safety threat.

---

[15] Carvalho's use of profanity during the Lieutenant checks was prolific. (*See* Doc. 163-6 at 30, 32-34, 39-46, 48, 52, 54, 56, 59, 63)

Even Carvalho's later threats are subject to "any number of reasonable inferences . . . not the least of which being (1) that the Defendants had consistently used [restraints] to punish [Carvalho], and (2) that [Carvalho] was upset and angry about an unjustified, punitive confinement." *Young*, 801 F.3d at 181. Thus, viewing the facts in the light most favorable to Carvalho, it is reasonable to infer that prison officials were primarily motivated by a desire to punish Carvalho for refusing a cellmate and for displaying what officials viewed as a "disrespectful" attitude toward prison staff, rather than as a result of any legitimate security concern.

Further supporting Carvalho's claim is the fact that, by keeping Carvalho in restraints after any threat had passed, prison officials would have violated controlling regulations. BOP regulations provide that restraints may not be used "[a]s a method of punishing an inmate," and permit officials to only "temporarily apply such restraints to an inmate to prevent that inmate from hurting self, staff, or other, and/or to prevent serious property damage." 28 C.F.R. §§ 552.22(d), (h). Those regulations further clarify that "[s]taff are authorized to apply physical restraints necessary to gain control of an inmate who appears to be dangerous because the inmate: (a) Assaults another individual; (b) Destroys government property; (c) Attempts suicide; (d) Inflicts injury upon self; or (e) Becomes violent or displays signs of imminent

violence."  *Id.* § 552.20.  During the lengthy period when Carvalho made no threats, a reasonable jury could conclude that prison officials violated controlling BOP regulations by restraining Carvalho after any threat had passed; this in turn permits the inference that restraints were continued maliciously and sadistically to cause harm.  *See Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 232 (3d Cir. 2015) (concluding "that the prison personnel did not follow the regulations gives some support to an inference that [their actions were] malicious"); *Miller v. Leathers*, 913 F.2d 1085, 1088 (4th Cir. 1990) (en banc) (noting that "violation of [prison] regulation . . . support[s] an inference" that prison official intended to use excessive force).

Furthermore, both Bledsoe and Edinger stated in their depositions that ambulatory restraints would only be used when a prisoner presented a direct threat, and not solely because he refused a cellmate.  Edinger testified that a prisoner should be removed from ambulatory restraints once he is no longer "trying to either hurt himself or others . . ."  (Doc. 170-19 at 35). Bledsoe likewise testified that "one of the last things you want to do as a corrections person is to place an inmate in restraints" and restraints should generally only be used if there is a danger that the prisoner will "be assaultive or destructive."  (Doc. 170-17 at 48-49).  Keeping Carvalho in restraints after any threat dissipated defies these standards.

Finally, beyond the possible violations of BOP regulations and the practices of Bledsoe and Edinger, an examination of the relevant use-of-force-factors demonstrates that a genuine issue of material fact precludes summary judgment. As to "the need for the application of force," *Ricks*, 891 F.3d at 480, given that a reasonable juror could conclude that any threat from Carvalho ceased long before he was released from ambulatory restraints, the use of restraints was far in excess of any force required.[16] Moreover, prison officials did little to temper the severity of their response once the threat abated, but instead simply left Carvalho in ambulatory restraints rather than try a different tack. Balanced against those factors is the consideration that Carvalho did not suffer significant injuries, although the restraints caused scabbing on Carvalho's wrists, ankles, and torso.[17] (Doc. 170-5 at

---

[16]    No other issue would justify the use of ambulatory restraints. Although the use of profanity undoubtedly must be curbed within a prison, regulations require officials to use the least restrictive means available to control an inmate. (Doc. 170-17 at 43). It is questionable whether ambulatory restraints were the least restrictive means available to stop Carvalho from using profanity. Indeed, given the context of his profanity, it is readily inferable that removing Carvalho's ambulatory restraints would have been far more successful at curbing profanity than leaving those restraints on. Additionally, although Carvalho disobeyed orders to accept a cellmate, he was eventually released to a single cell without having agreed to accept a cellmate (Doc. 170-5 at 47), which strongly indicates that the use of ambulatory restraints was not required based on the refusal to accept a cellmate, and that the amount of force used was excessive. (*See* Docs. 170-17 at 49-50; 170-19 at 33-35 (both Bledsoe and Edinger stating that ambulatory restraints are not warranted simply for refusing cellmate)). The Court has no doubt a prison must enforce its orders to maintain the security of the institution. However, given the relevant regulations and testimony, it is doubtful that the use of ambulatory restraints is the proper way to enforce the order given in this instance.

[17]    Defendants repeatedly assert that medical checks demonstrated no injuries. (Doc. 164 at 51;

55). Several days into Carvalho's time in restraints, it would have been apparent that he was subdued and any "safety concerns had long since abated," meaning that Carvalho's unnecessary restraint "serve[d] no penological justification." *Young*, 801 F.3d at 180.

In sum, when viewed in the light most favorable to Carvalho, a reasonable jury could find that Bledsoe violated Carvalho's Eighth Amendment rights by authorizing the use of ambulatory restraints until February 28, 2011.

b. March 11, 2011, Use of Restraints

As to the March 11, 2011, use of restraints, Carvalho was placed in ambulatory restraints at approximately 12:35 p.m. after threatening to attack any cellmate with whom he was placed, and was released from restraints at approximately 8:15 p.m. that same day. (Doc. 163-3 at 57, 73-74). The fifteen-minute restraint checks reveal little about Carvalho's actions during his period of restraint. (*Id.* at 73-74). The Lieutenant checks demonstrate that correctional officers were initially unable to determine whether Carvalho had regained self-control but, by that evening, officers determined that

_____

Doc. 174 at 8). Although it is true that the medical checks do not discuss any injuries, they reveal very little about Carvalho's physical state, with the exception of a notation on February 24, 2011, indicating that Carvalho had a rash on his neck and chest. (Doc. 163-7 at 3). Otherwise, the checks simply note that Carvalho generally appeared healthy. (Doc. 163-6 at 88-100; Doc. 163-7 at 1-11). These records therefore demonstrate, at most, a genuine issue of material fact regarding the injuries that Carvalho suffered.

Carvalho had regained his composure and could safely be released from restraints. (*Id.* at 75-76).

Unlike the February 18, 2011, use of restraints, in this instance there is no evidence demonstrating that Defendants left Carvalho in restraints any longer than necessary to maintain security. The use of ambulatory restraints in such circumstances do not cross the threshold into a violation of Carvalho's Eighth Amendment rights. Rather, the use of restraints was both justified and proportionate to the threat that Carvalho presented at the time and—once the threat abated—officers removed the restraints. Moreover, there is no evidence that Carvalho suffered any injury from this incident.

The March 11 use of restraints is markedly different from other circumstances in which courts have concluded that a similar duration in restraints may be unlawful. For example, in *Hope*, although the plaintiff was only restrained for seven hours, he was shackled to a hitching post in a restricted position and subjected "to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks" despite the fact that "[a]ny safety concerns had long since abated." 536 U.S. at 738. Similarly, in *Young* the plaintiff was subdued but nevertheless strapped naked to a four-point restraint[18] chair—in a cold

---

[18]  The use of four-point restraints is itself a distinguishing feature since, as the United States

room—for fourteen hours. 801 F.3d at 175-76, 181. Despite the lack of any emergency situation, correctional officers left the plaintiff in the chair in violation of prison regulations, resulting in the plaintiff shaking uncontrollably from the cold and his legs becoming numb and unable to support his weight. *Id.* at 181-82. None of those factors were present on March 11. In light of the absence of any evidence demonstrating that the use of restraints was unwarranted or unnecessarily prolonged, summary judgment will be granted to Defendants with respect to the March 11, 2011, use of restraints.

### c. August 19, 2011, Use of Restraints

Finally, on August 19, 2011, Carvalho was placed in a cell with another inmate and threatened to attack that inmate. (Doc. 163-3 at 83, 85). As a result, Carvalho was placed in ambulatory restraints at approximately 10:54 a.m. (*id.* at 85; Doc. 163-4 at 37) and was left in restraints until approximately 3:30 a.m. on September 1, 2011. (Doc. 163-4 at 81). As with Carvalho's February 11 restraint, prison officials conducted restraint checks every fifteen minutes, Lieutenant checks every two hours, and Bledsoe reauthorized the use of restraints every 24 to 48 hours. (Doc. 163-4 at 37-100; Doc. 163-5 at 1-87).

---

Court of Appeals for the Fourth Circuit has noted, such restraints are severe and a measure of "last resort." *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996).

After Carvalho was placed in restraints, he remained aggressive and threatened to assault others during the first few hours of his restraint. (Doc. 163-4 at 82). Thus, on August 20, 2011, Bledsoe authorized officials to continue the use of restraints based upon Carvalho's disrespectful attitude and threats to harm others. (Doc. 163-5 at 22-24). Although Carvalho used profanity on a near daily basis during the remainder of his time in ambulatory restraints, none of the prison checks reveal any threats of violence until August 31, twelve days after Carvalho was first placed in restraints. (Doc. 163-5 at 19; *see* Doc. 163-4 at 82-100, Doc. 163-5 at 1-21). The absence of any threats of violence between August 19 and August 31 significantly undercuts any assertion that Carvalho was kept in restraints because prison officials believed that he presented a threat.

Again, the Lieutenant checks and Bledsoe's reauthorizations of the use of restraints indicate that Carvalho did not pose a safety risk and that restraints may have been continued only because Carvalho refused to accept a cellmate and displayed a poor attitude. For example, in all memoranda reauthorizing the use of restraints issued after August 20, Bledsoe did not rely on a safety threat but, instead, authorized restraints because Carvalho continued to display a poor attitude or act in a disrespectful, disruptive, or uncooperative manner. (*See* Doc. 163-5 at 25-

39).   Several Lieutenant checks explicitly note that Carvalho refused to accept a cellmate (Doc. 163-4 at 89, 92-93, 99; Doc. 163-5 at 4, 6, 8, 12, 15-16, 18-19), and, on August 29, 2011, Bledsoe reauthorized restraints, noting that "inmate Carvalho told the Lieutenant 'I'll never house with anyone as long as I'm here.'"  (Doc. 163-5 at 35).

Not only do the checks belie the notion that Carvalho presented a threat, but they frequently expose that prison officials were far more concerned with Carvalho's attitude toward them than with any danger that Carvalho may have posed.  For example, in one check a Lieutenant stated "Inmate continues defiance & disrespect, he continues to intentionally ignore me.  Remain in restraints."  (Doc. 163-5 at 9).  On other occasions Carvalho was described as having a poor attitude—and therefore worthy of continued restraint—because he refused "to respond to any questions" (*id.* at 10) or "acknowledge staff" (*id.* at 12).   The facts are in many respects more favorable to Carvalho than those surrounding the February 11 use of restraints and, for same reasons, the Court concludes that a genuine issue of material fact exists as to whether Bledsoe acted maliciously and sadistically in keeping Carvalho in ambulatory restraints for approximately thirteen days.   For that reason, summary judgment will be denied with respect to the August 19, 2011, use of restraints.

d. Qualified Immunity

Lastly, Defendants contend that, even if they violated Carvalho's rights, they are entitled to qualified immunity because any such right was not clearly established at the time that it was violated. (Doc. 164 at 48-52). Government officials are shielded from liability under the doctrine of qualified immunity "unless a plaintiff can establish that the official violated a statutory or constitutional right, and that the right was 'clearly established at the time of the challenged conduct.'" *Bryan v. United States*, 913 F.3d 356, 362 (3d Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "To be clearly established, a right's contours must be 'sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it' and that 'existing precedent placed the statutory or constitutional question confronted by the official beyond debate.'" *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765 (2014) (ellipsis omitted)). "Further, as the Supreme Court recently reiterated, 'clearly established law should not be defined at a high level of generality' but must instead 'be particularized to the facts of the case.'" *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). Nevertheless, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

Given the facts and reasonable inferences set forth above, the Court concludes that Bledsoe is not entitled to qualified immunity at this time. Nearly one decade before Carvalho was placed in ambulatory restraints, the Supreme Court held that, where an inmate has already been subdued and safety concerns have abated, the use of mechanical restraints constitutes excessive force. *Id.* at 738. It was therefore clearly established by February 16, 2011, that maintaining Carvalho in ambulatory restraints when he no longer posed a threat violated his constitutional rights. *See Richardson v. Kane*, No. 3:11-CV-2266, 2013 WL 1452962, at *16 (M.D. Pa. Apr. 9, 2013) (concluding that, absent threat, right to avoid extended duration in ambulatory restraints was clearly established by at least early February 2011), *vacated on other grounds sub nom.*, *Richardson v. Bledsoe*, 829 F.3d 273 (3d Cir. 2016).

Moreover, the relevant BOP regulations provided notice to Bledsoe that the use of restraints was only authorized where an inmate posed an active risk of destroying property or harming himself or others. 28 C.F.R. §§ 552.20, 552.22. Thus, continuing to restrain Carvalho after any safety concerns had abated violated BOP rules, which further emphasizes that Carvalho's right to be free from restraint was clearly established by February 2011. *See Hope*, 536 U.S. at 743-44 (noting violation of regulations

governing conduct of prison officials is relevant to determine whether right was clearly established); *Young*, 801 F.3d at 182 (same). The Court will therefore deny qualified immunity at this time.

### iii.     First and Fourteenth Amendment Access to the Courts Claim

Lastly, Carvalho contends that Defendants interfered with his access to the courts by opening and reading his legal mail and by preventing him from exhausting his administrative grievances. (Doc. 57 at 34-37). Defendants argue that this claim fails because Carvalho has no constitutional right to an administrative grievance process and cannot show any injury. (Doc. 164 at 42-47).

"Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008). To establish a claim for denial of access to the courts, a plaintiff must allege that his access to the courts was impaired, and that he suffered actual injury because of Defendants' actions. *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006). Actual injury results when a prisoner "has been hindered in an effort to pursue a nonfrivolous legal claim," *id.*, which includes "the loss or rejection of a legal claim." *Oliver v. Fauver*, 118 F.3d 175, 177 (3d Cir. 1997); *see also Lewis v. Casey*, 518 U.S. 343, 349-51 (1996).

Assuming that Defendants interfered with Carvalho's access to the courts, this claim fails because Carvalho cannot point to any injury resulting from that interference.  As Carvalho concedes, injury would result only if this Court were to dismiss Carvalho's claims on the ground that he failed to exhaust his administrative remedies.  (Doc. 170 at 37-40).  Because this Court concludes that Carvalho's failure to exhaust his administrative remedies should be excused, he cannot establish that he "has been hindered in an effort to pursue a nonfrivolous legal claim" and summary judgment is appropriate based on the absence of any cognizable injury.  *Jones*, 461 F.3d at 359.

## III.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted in part and denied in part.  An appropriate Order follows.

*s/ Malachy E. Mannion*
Malachy E. Mannion
U.S. District Judge

Dated: August 13, 2019
11-1995-01